H. WILLIAM METZLER, Ralph O. Metzler, and Arthur M. Metzler, Copartners Doing Business Under the Firm Name and Style of H. W. Metzler & Sons, Respondents, v. O. J. BARNES COMPANY, a Corporation, Appellant.

(— A.L.R. —, 226 N. W. 501.)

Opinion ·filed July 2, 1929.   Rehearing  denied  August  13,  1929.

*McIntyre, Burtness & Robbins,* for appellant.

*Murphy & Toner,* for respondent.

Nuessle, J.   This is an action to recover damages on account of the breach of a contract to sell and deliver potatoes.

The plaintiffs are a co-partnership engaged in the business of buying and selling potatoes at wholesale in Decatur, Illinois.   The defendant is a corporation engaged in the wholesale produce business at Grand Forks, North Dakota.   O. J. Barnes is its president and is actively in charge of the business.   M. J. Quinlan is a produce broker doing business under the name of Quinlan & Company and having his office at Decatur, Illinois.   The defendant has been engaged in the wholesale produce business for many years.   For ten or twelve years off and on Quinlan has sold potatoes for it in Illinois.   On September 16, 1926, Quinlan received quotations from the defendant offering potatoes for future delivery in car lots at $2.25 per cwt. f. o. b. Decatur, Illinois.   As a trade practice potatoes are shipped in two bushel sacks, 300 sacks, 36,000 pounds, making a car.   On September 17 Quinlan learned that the plaintiffs were in the market for potatoes so he called at their office in Decatur and endeavored to sell some for the defendant

at the price quoted. The plaintiffs made a counter offer of $2.20 per cwt. for ten cars. Quinlan immediately and in the presence and hearing of the plaintiffs called the defendant over the long-distance telephone. His testimony practically undisputed as to the conversation ensuing, is as follows: "I told Mr. Barnes I had a sale to Metzler & Sons for ten cars at $2.20 per cwt. delivered at Decatur or Decatur freight rate points, for shipment between October 1st and 15th, 1926, and that he would have to furnish Government inspection certificate on each car showing the cars to be U. S. 1 and that Mr. Metzler would agree to $100 per car deposit with him. Mr. Barnes, however, would not agree to furnish a Government certificate of inspection at the price stated; he agreed to accept $2.20 per cwt. delivered for the potatoes, but that Mr. Metzler would have to pay, as I remember it, $10 per car for the inspection certificate covering each car. I then advised Mr. Metzler of the conditions, advised Mr. Metzler that Mr. Barnes would accept his offer of $2.20 for ten cars, shipment October 1st to 15th, at Mr. Metzler's option of time, providing Mr. Metzler would pay the government inspection cost of $10 per car, and also Mr. Metzler to pay $1,000 or $100 per car deposit, the deposit to be credited on each draft at $100 per car to Mr. Metzler's account as each draft was drawn. I asked Mr. Barnes if I should draw the memorandum of sale for Mr. Metzler's signature and further get Mr. Metzler's check to cover the $1,000 deposit, and he advised me that he would draw the contract and draw a draft for $1,000 through the bank and send it to Decatur for collection on H. W. Metzler & Sons. . . . I advised him that Mr. Metzler would take the cars and pay him $2.20 per cwt. delivered at Decatur, Illinois or Decatur, Illinois freight rate points for shipment between October 1st and 15th, the time of shipment to be at the option of Mr. Metzler, and Mr. Metzler would pay for the inspection at a cost of $10 per car and would pay him $100 per car deposit and that it would be satisfactory for him to make a draft on Mr. Metzler for the $1,000 inasmuch as he preferred handling it." The Metzlers heard Quinlan's end of the telephone conversation and Quinlan repeated to them the substance of what Barnes said. The Metzlers thereupon said they would take ten cars on the terms proposed. Quinlan then advised Barnes, told him to send the draft to the Citizens

National Bank and asked him to wire confirmation of the sale. Accordingly and on the same day Barnes telegraphed Quinlan as follows:

"We confirm ten cars U.S. 1 Ohios to Metzler shipment to October fifteenth at two twenty delivered Decatur rate points we to furnish certificate inspection at ten dollars per car extra one hundred dollars per car to be paid at once balance on shipment we will book five more at five cents cwt additional acceptance by Wednesday next.

O. J. Barnes Co."

Quinlan thereupon made out and mailed to the plaintiffs and to the defendant the following:

## "CONFIRMATION FROM THE OFFICE OF QUINLAN & COMPANY, BROKERS, DECATUR, ILLINOIS.

"No. 13263.

"September 17th, 1926.

"Date of Sale Sept. 17th, 1926.

"Buyer's Copy.

"All sales subject to confirmation.

"Shipper given below has confirmed your car as listed.

"H. W. Metzler & Sons, Decatur, Illinois.

"(Description of goods as sold herewith listed).

"10 cars US #1 Branded Red River Ohios two bushel bags per cwt. delivered Decatur rate points $2.20.

"Shipment as wanted by H. W. Metzler & Sons from October 1st to October 15th, $100 per car advanced by H. W. Metzler & Sons. H. W. Metzler & Sons to pay $10 per car for government inspection. Certificate to be forwarded to H. W. Metzler & Sons.

"Shipper O. J. Barnes Co., located at Grand Forks, N. D.

"Car to be routed via. . . . . . .

"Car Number and initial . . . . . . . . .

"When ship: as above.

"Draft at Citizens Bank Decatur.

"Cars are requested routed as above, however routings are not guaranteed and have no effect upon the purchase of the car or cars. We quote freight rates only as given us by the railroad company and we

absolutely refuse to be held responsible for misquoted rates. If any mistake in the above notify us immediately."

Barnes also prepared and signed the following writing:

## "MEMORANDUM OF SALE.

"Sold to H. W. Metzler & Sons of Decatur, Illinois, ten (10) cars of potatoes, six hundred (600) bushels each U. S. No. 1 Red River Ohios in new branded bags at $2.20 per cwt. delivered Decatur, Illinois, or station of equal freight rate shipment to be made at buyer's option up to October 15th, 1926, but after September 27th, 1926.

"Seller agrees to furnish certificate of inspection if requested at an additional charge of $10.00 per car.

"Terms: Advance payment of $1,000, receipt of which is hereby acknowledged, balance of purchase price to be paid on arrival of cars.

"O. J. Barnes Company.

"By O. J. Barnes.

"Pres.

"The above purchase hereby confirmed.

"..............................................................

"Made in duplicate."

He then drew a draft on the plaintiffs for $1,000 and caused this writing with draft attached to be sent by the First National Bank of East Grand Forks to the Citizens National Bank of Decatur. The draft was dated September 18th. These papers were received by the Citizens National Bank on September 21st. Through some oversight on the part of the bank the plaintiffs were not notified that the papers had been received by the Citizens Bank nor was the draft presented to the plaintiffs for payment. Plaintiffs' testimony is that they were ready, willing and anxious to make the payment of $1,000 and enquired daily at all of the banks in Decatur as to whether the draft and contract had been received, but were unable to locate them. On September 23rd the defendant or the First National Bank of East Grand Forks, the evidence does not disclose which, called the Citizens Bank by phone, enquired if the draft had been taken up, and on being advised that it had not, directed that the draft and contract be at once

returned. This direction was complied with on September 23rd. It does not definitely appear when the plaintiffs learned that the draft and contract had been sent to Decatur and thereafter recalled, but plaintiffs apparently acquired this knowledge a short time after the recall. On September 24th, (Friday) Quinlan enquired of Barnes by telegraph as to where the draft was sent and Barnes evasively answered: "Bank closed. Don't know where bank sent it but some Decatur bank presented it Monday. Was demand draft and to be returned if not paid on presentation as per terms sale and our agreement bank." There was a further interchange of letters and telephone and telegraph messages between the several parties. Quinlan and the plaintiffs insisted that the sale was completed. The defendant denied that it was and refused to go forward with it. In the meantime the price of potatoes had gone up appreciably. The plaintiffs had contracted the ten cars to various of their customers on the basis of the arrangements made with the defendant. The defendant refused to deliver and the plaintiffs brought this action for damages on account of such refusal. The case was tried in the District Court of Grand Forks County without a jury and the plaintiffs had judgment. From this judgment the defendant appeals.

On this appeal the sole questions are, first, as to whether there was a completed contract, and, second, if there was, whether the same was enforceable. In that behalf of the defendant contends that there was no completed contract; that what was said and done was merely a matter of negotiation and clearly indicated that both parties contemplated that though the terms of the contract were agreed upon, such terms should be expressed in a formal contract to be written and signed and a payment of $1,000 should be made before any contract was to be considered as completed; further, that even though a contract was completed on September 17th, it was within the North Dakota statute of frauds, and therefore can not be enforced in the courts of North Dakota. On the other hand, the plaintiffs contend that Quinlan was the defendant's broker and agent; that the terms of the completed contract were mutually agreed upon in their office on September 17th and that both they and the defendant signified an intention to be bound by those terms; that the contract is an Illinois contract and that the

defendant has not pleaded nor proved and does not rely upon any statute of frauds of Illinois to relieve him from performance.

Of course it is not essential to a completed contract that the same be in writing. It is enough if the terms are mutually understood and there is mutual assent thereto. If there is an offer and an acceptance, a meeting of the minds of the parties, then it follows that a contract has been made though there is no writing. And the fact that it is agreed that its terms shall be reduced to writing and signed does not make an oral agreement any the less a contract unless it is further expressly or impliedly stipulated that until the writing is executed the parties are not to be bound. See Mississippi & D. S. S. Co. v. Swift, 86 Me. 248, 41 Am. St. Rep. 545, 29 Atl. 1063; Sanders v. Pottlitzer Bros. Fruit Co. 144 N. Y. 209, 29 L.R.A. 431, 43 Am. St. Rep. 757, 39 N. E. 75. If it appears that the parties to a negotiation did not intend to be bound until the resulting agreement, however definitely arrived at, should be reduced to writing and signed, there is no contract until that is done. Massee v. Gibbs, 169 Minn. 100, 210 N. W. 872; Mississippi & D. S. S. Co. v. Swift, supra; 6 R. C. L. 618. But the burden of establishing that a contract otherwise sufficient was not to be considered as complete until reduced to writing and signed, rests upon him who on that account denies the obligations thereof. Williston, Contr. § 28 and cases cited. That a contract is to be put into writing and signed is a circumstance of more or less weight in determining whether it is to be considered as completed until this is done. But it is not by any means conclusive. In the instant case Barnes made an offer. The Metzlers made a counter offer. Barnes refused this counter-offer and made a further offer with modifications. Metzlers accepted this latter offer as made. Barnes then said he would prepare a memorandum of the sale and send it forward with a draft for the amount of the payment that was to be made at once. Barnes then confirmed the sale by his telegram to Quinlan but made no mention therein of a further memorandum or the draft. Thus there was an offer and an acceptance. All of the terms of the contract were mutually understood and agreed upon. Nothing was left to be done excepting to perform. While it was agreed there should be a written memorandum, it was not expressly agreed there should be no completed contract until this memorandum was made and signed. Nor do we think it can be said

that there was an implied agreement to this effect. The sending of the telegraphic confirmation negatives this. The trial court was therefore right in holding that there was a completed contract. See authorities above cited.

The plaintiffs were at all times ready and willing to perform. Defendant subsequently refused to perform on the theory that it had the right to withdraw at any time until the contract had been reduced to writing and signed by the parties and the partial payment made. In this the defendant was mistaken. Therefore, unless there exists some statutory reason why the contract cannot be enforced against the defendant, it must be held to have breached the contract and to be responsible for such damages as were suffered by the plaintiffs on account of the breach. It then becomes necessary to determine whether the contract is unenforceable as against the defendant because within the statute of frauds.

Section 6002a4, 1925 Supplement to the North Dakota 1913 Compiled Laws, reads:

"A contract to sell or a sale of any goods or choses in action of the value of five hundred dollars or upwards shall not be enforceable by action unless the buyer shall accept part of the goods or choses in action so contracted to be sold or sold, and actually receive the same, or give something in earnest to bind the contract, or in part payment, or unless some note or memorandum in writing of the contract or sale be signed by the party to be charged or his agent in that behalf."

The defendant pleads that the contract, if there was a contract, is within this statute and so unenforceable against it. Defendant insists that if there was a contract it was a North Dakota contract. On the other hand, plaintiffs insist that the contract was an Illinois contract and therefore the North Dakota statute cannot be invoked. In our view of the matter it is immaterial whether the contract be considered a North Dakota contract or an Illinois contract. In either event it was enforceable under the statute quoted. Quinlan was a broker. He acted as the intermediary between the plaintiffs and the defendant. In other similar transactions he had been paid for his services by the defendant. He expected to be thus paid in the instant transaction. He never was paid by those who bought. He always was paid by those who sold. As a broker under the circumstances here disclosed he

was primarily the agent of the defendant. See Turner v. Crumpton, 21 N. D. 294, 130 N. W. 937, Ann. Cas. 1913C, 1015; 9 C. J. 518. But there was no reason why he should not act as the agent for both the plaintiffs and the defendant if both consented that he do so. We think that he did so act in the instant case with the consent of each. He acted as the negotiator between them. He conveyed the defendant's offer to the plaintiffs and the plaintiffs' counter offer to the defendant. He finally brought about the meeting of the minds of the contracting parties by acting for each. He was not a mere conduit. Each knew that he was acting for the other and each assented to his doing so. Had he signed the confirmation of sale sent to the defendant on September 17th, we have no doubt that he would have been acting within his authority and thereby would have met the requirements of the statute so as to render the contract enforceable as against the plaintiffs. See Butler v. Thomson, 92 U. S. 412, 23 L. ed. 684; 9 C. J. 518. And likewise the requirements of the statute would have been complied with so as to render the contract enforceable as against the defendant as well. So when on September 17th Barnes telegraphed to Quinlan the confirmation of the sale as made, he must have done so in contemplation of the fact that Quinlan was not only the defendant's agent to sell but also the plaintiffs' agent to buy, and that he would receive the message as agent for both. Otherwise there was no reason for sending the confirmation. This message contained all the terms of the sale. It was as complete as the memorandum later prepared by Barnes. It constituted a sufficient memorandum to meet the requirements of the statute.

The judgment is affirmed.

BURKE, Ch. J., and BURR, CHRISTIANSON, and BIRDZELL, JJ., concur.